❒ Original ❒ Duplicate

CLERK'S OFFICE
A TRUE COPY
May 06, 2024
s/ Mariah Kauder
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
2643 W. Atkinson Ave, Milwaukee, WI 53209 (SUBJECT PREMISES), including the retail store area, basement, second floor area, and any adjoining storerooms or employee areas, as well as the person of Nael Jabbar and of employees present at the SUBJECT PREMISES, including all items in their possession, on their person, or in areas within their immediate control as well as the gray Cadillac Sport Utility Vehicle bearing WI plate ALG 5204 present at SUBJECT PREMISES, and more fully described in Attachment A

Case No. 24-M-396 (SCD)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the Eastern District of Wisconsin *(identify the person or describe the property to be searched and give its location)*:

see Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

see Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before 5-20-24 *(not to exceed 14 days)*

X in the daytime 6:00 a.m. to 10:00 p.m. ❒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to U.S.Magistrate Stephen C. Dries.
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for ____ days *(not to exceed 30)* ❒ until, the facts justifying, the later specific date of ________.

Date and time issued: 5-6-24. 11:25 am

Stephen C. Dries
*Judge's signature*

City and state: Milwaukee, WI

U.S. Magistrate Judge Stephen C. Dries
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ______________________

______________________
*Executing officer's signature*

______________________
*Printed name and title*

## ATTACHMENT A

## PREMISES AND PERSONS TO BE SEARCHED

1. The **Subject Premises** is located at 2643 W. Atkinson Ave., Milwaukee, Wisconsin 53209, including the retail store area, basement, second floor area, and any adjoining storerooms or employee areas. The **Subject Premises** is a two-story building accessible through an entrance located at the front of the building and behind double glass doors. Photographs of the **Subject Premises** are set forth below.





2. The person of Nael Jabbar and of employees present at the **SUBJECT PREMISES**, including all items in their possession, on their person, or in areas within their immediate control.

3. The gray Cadillac Sport Utility Vehicle bearing Wisconsin plate number: ALG 5204 present at the **SUBJECT PREMISES**.



WISCONSIN
ALG-5204

**ATTACHMENT B**
**PROPERTY TO BE SEIZED**

Evidence, instrumentalities and fruits concerning violations of SNAP benefits fraud, in violation of 7 U.S.C. Sections 2024(b)(1) and (c), and wire fraud, in violation of 18 U.S.C. Section 1343, as follows:

1. Records of SNAP and non-SNAP sales transactions, including EBT records, sales tapes, receipts, and ledgers;

2. Records of store inventory and product orders, including invoices, bills, delivery receipts, items of payment, payment receipts, vendor information, and ledgers;

3. Records of cash disbursed to SNAP recipients, including EBT records, ledgers, and logs;

4. United States currency over approximately $500, jewelry, bullion, and other items of value exceeding approximately $500;

5. Records and keys relating to safe deposit boxes;

6. Records of payments received from SNAP, including bank account records, merchant records from third-party processors, and receipts;

7. Correspondence and records related to U.S. Department of Agriculture, Food and Nutrition Service, SNAP benefits, and other Food and Nutrition Service programs;

8. POS devices and cash register devices and any associated documents, including instruction manuals;

a. With respect to searches of POS devices and other cash register devices,

investigating agents may conduct a cancelled transaction on such devices in order to identify electronically stored information, including device identifiers, any FNS number or other account identifiers assigned to the device, and the identity of the payment processing company that services the device;

b.      With respect to searches of POS devices and other cash register devices, investigating agents may also cause the device to print a receipt or otherwise provide information regarding totals or subtotals run electronically stored in the device at the time of the search;

9.      Surveillance footage showing SNAP trafficking being conducted at the **Subject Premises**, including any exterior footage showing customers leave the store with few or no grocery items eligible for SNAP;

10.     Any credit and debit cards, Quest/EBT cards, customer state identification cards and driver's licenses, and related records;

11.     Employee lists and contact information, work schedules, personnel files, and payroll;

12.     Any and all records related to the ownership and occupancy of the **Subject Premises** and ownership or possession of a financial interest in business being conducted at **Subject Premises**, including correspondence, agreements, contracts, stock certificates, articles of incorporation, business licenses, Food and Nutrition Service applications, state and federal tax records, bank records, accounting records, checkbooks, copies of deposited or withdrawn check, ledgers, and payment receipts;

13. Computer hardware, computer software, computer-related equipment, employee cellphones, surveillance video system, and other electronic devices, as necessary to facilitate the seizure of the items described in this attachment;

14. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates

to the crime under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any

mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smart phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

During the execution of the search of electronic devices, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of Nael Jabbar or of employees present to the fingerprint scanner of the device; and/or (2) hold the device in front of the face of Nael Jabbar or of employees present and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

This warrant authorizes a review of electronically stored information on the device in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the agents may deliver a

complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.



CLERK'S OFFICE
A TRUE COPY
May 06, 2024
s/ Mariah Kauder
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

2643 W. Atkinson Ave, Milwaukee, WI 53209 (SUBJECT PREMISES), including the retail store area, basement, second floor area, and any adjoining storerooms or employee areas, as well as the person of Nael Jabbar and of employees present at the SUBJECT PREMISES, including all items in their possession, on their person, or in areas within their immediate control as well as the gray Cadillac Sport Utility Vehicle bearing WI plate ALG 5204 present at SUBJECT PREMISES, and more fully described in Attachment A

Case No. 24-M-396 (SCD)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

see Attachment A

located in the Eastern District of Wisconsin, there is now concealed *(identify the person or describe the property to be seized)*:

see Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 7 U.S.C. §§ 2024(b)(1) & (c) | SNAP benefits fraud |
| 18 U.S.C. § 1343 | Wire fraud |

The application is based on these facts:

see attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of ______ days *(give exact ending date if more than 30 days:* ____________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

SAMUEL POELKER Digitally signed by SAMUEL POELKER Date: 2024.05.03 09:26:39 -05'00'

*Applicant's signature*

USDA OIG SA Samuel Poelker

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 5-6-24

Stephen C. Dries

*Judge's signature*

City and state: Milwaukee, WI

U.S. Magistrate Judge Stephen C. Dries

*Printed name and title*

**AFFIDAVIT**

I, Samuel Poelker, being duly sworn, state as follows:

1. I am a Special Agent with the U.S. Department of Agriculture, Office of the Inspector General ("USDA OIG"). I have been so employed since approximately April 2020.

2. As part of my duties as a USDA OIG Special Agent, I investigate criminal violations relating to USDA's Supplemental Nutrition Assistance Program ("SNAP"), wire fraud, access device fraud, and other financial crimes. I have participated in the execution of multiple federal search warrants relating to SNAP benefits fraud and wire fraud.

3. This affidavit is made in support of an application to search the grocery store doing business as HOT SPOT SUPERMARKET ("HOT SPOT"), located at 2643 W. Atkinson Avenue, Milwaukee, Wisconsin (the "Subject Premises").

4. Based on the facts disclosed in this affidavit, there is probable cause to believe that evidence, instrumentalities, and fruits, further described in Attachment B, of SNAP benefits fraud and wire fraud offenses, in violation of Title 7, United States Code, Sections 2024(b)(1) and (c); and Title 18, United States Code, Section 1343 ("the Subject Offenses"), are located at the Subject Premises.

5. The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being

submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are sufficient to establish probable cause to believe that evidence of the Subject Offenses is located at the Subject Premises.

## SUMMARY OF THE INVESTIGATION

6. This investigation is being conducted jointly by the USDA OIG, Internal Revenue Service - Criminal Investigation ("IRS-CI"), and the Milwaukee Police Department. The investigation is focused on allegations that employees of the **Subject Premises** are exchanging cash for SNAP benefits.

7. As part of this investigation, agents obtained data related to SNAP benefit redemptions for HOT SPOT, a medium-sized grocery store operating at the **Subject Premises** that is authorized to conduct SNAP benefit redemptions. The data indicated that the total volume of SNAP redemptions at that location exceeded the volume of SNAP redemptions at comparable grocery stores in the Milwaukee County area by more than five times.

8. In furtherance of the investigation, agents have conducted controlled transactions utilizing a Confidential Human Source ("CHS") at the **Subject Premises**. These controlled transactions revealed that the owner, NAEL JABBAR ("JABBAR"), and one employee exchanged cash for SNAP benefits.

## FACTS SUPPORTING PROBABLE CAUSE TO SEARCH

### I. Background of SNAP Program

9. SNAP, formerly known as the Food Stamp Program, is a federal benefit program intended to assist low-income individuals and families with purchasing food. The purpose of SNAP is "to promote the general welfare and to safeguard the health and wellbeing of the Nation's population by raising the levels of nutrition among low-income households." 7 C.F.R. § 271.1(a).

10. SNAP is managed by the Food and Nutrition Services ("FNS"), an agency within the USDA, and is administered by state agencies. The Wisconsin Department of Health Services ("DHS") is responsible for administering SNAP in Wisconsin. Since 1999, SNAP benefit recipients in Wisconsin have received their allotted SNAP benefits electronically on an Electronic Benefits Transfer ("EBT") card. The EBT card is commonly known as a "Quest Card" in Wisconsin.

11. Once an individual or household has been approved to receive SNAP benefits, the recipient is given a Quest card and authorized to receive a monthly SNAP benefit amount. The SNAP benefit amount an individual may receive is based on various factors such as household size, income, and certain expenditures. Each month, a recipient's SNAP benefits are deposited onto his or her Quest card account.

12. A recipient may use the allotted SNAP benefits on his or her Quest card to purchase eligible food items from authorized retailers. SNAP benefits may not be exchanged for cash. SNAP benefits also may not be used to purchase alcohol, tobacco, hot foods, food sold for on-premises consumption, and non-food products.

13. Not all businesses are authorized to participate in SNAP. For a store to be eligible to accept SNAP benefits, a store operator is required to complete, sign, and submit a SNAP application, known as Form FNS-252 or FNS 252-E (if completed electronically), to the FNS. Form FNS-252 requires the store operator to provide certain information, including: (1) the store's name and location; (2) names and addresses of all officers, owners, partners, and members of the business; (3) the store's actual or estimated retail sales; (4) information related to the types of products sold by the store; and (5) information regarding the business's integrity and reputation, including whether any officers, owners, partners, or members of the business previously were denied, withdrawn, suspended, or fined because of SNAP violations.

14. Furthermore, FNS Form-252 provides a certification and signature form whereby the applicant agrees to comply with all statutory and regulatory requirements associated with participation in SNAP. Specifically, Form-252 requires that the applicant certify that they accept responsibility for violations of any SNAP regulations, including those committed by any of the firm's employees. As detailed on Form-252, violations of the SNAP regulations include trading cash for SNAP benefits (trafficking), accepting SNAP benefits as payment on credit accounts or loans, accepting SNAP benefits as payment for ineligible items, and knowingly accepting SNAP benefits from people not authorized to use them.

15. According to the training materials provided on the FNS website, FNS may send a representative to visit the retail store to determine its eligibility to participate in the SNAP program. FNS also may require the applicant to provide

additional information or documents relating to the nature and scope of the business and the business's integrity and reputation.

## II. Processing of SNAP Benefit Transactions

16. Similar to the process used in a traditional debit card transaction, a SNAP benefits recipient in Wisconsin can use the SNAP benefits on his or her Quest card to make eligible food purchases by swiping his or her Quest card at a participating retailer through a point-of-sale ("POS") device and entering his or her personal identification number ("PIN"). A retailer may obtain a POS device capable of accepting Quest cards through the State's SNAP contractor or through a third-party processor.

17. Beginning in or around November 2017, in Wisconsin, the Wisconsin DHS contracted with Fidelity National Information Services ("FIS") to administer USDA reimbursement for SNAP benefits. A Wisconsin retailer authorized to redeem SNAP benefits may contract directly with FIS for its SNAP transactions or it may contract with a third-party processor.

18. According to FNS, the following is applicable to retailers who contract directly with FIS:

a. When a retailer conducts a SNAP transaction using a Quest card, the retailer's POS device transmits the transaction information, the amount of the transaction, and the Quest card number to FIS computer systems located in Milwaukee, Wisconsin. FIS determines whether the recipient's account has sufficient funds to cover the transaction and sends a return transmission to

the POS machine either approving or denying the transaction. The POS machine then generates a receipt showing, among other things, the store's name and address, the last four digits of the Quest card number, the amount of the transaction, and the recipient's SNAP benefits balance.

b. At a set cutoff time each day, FIS determines the total amount of SNAP transactions for the retailer's account for that day. FIS subsequently causes an electronic payment for that amount to be made to the retailer's designated bank account, typically within one to two business days.

c. To obtain the funds from USDA, FIS sends an electronic request for funds transfer to the Federal Reserve Bank of Richmond in Richmond, Virginia. The Federal Reserve Bank of Richmond then electronically transfers the funds to the State of Wisconsin's designated bank, managed by FIS, in Minneapolis, Minnesota. The State of Wisconsin's bank, in turn, transfers the funds to the retailer's bank account.

19. According to FNS, retailers that use a third-party processor to conduct their SNAP transactions use a similar transaction process to the process described above, except that the retailer interacts with the third-party processor, which, in turn, interacts with FIS. Specifically, the following is applicable to retailers that use a third-party processor:

a. When the retailer conducts a SNAP transaction using a Quest card, the retailer's POS device sends the transaction information by wire communication to the third-party processor, which then sends the information

by wire communication to FIS's computer system in Milwaukee, Wisconsin. Once FIS determines whether the Quest card has sufficient funds, it sends a return wire communication back to the retailer's POS device, through the third-party processor.

b. After FIS conducts its daily settlement, it requests a funds transfer from the Federal Reserve Bank of Richmond. The Federal Reserve Bank of Richmond electronically transfers the funds to the State of Wisconsin's designated bank, managed by FIS, in Minneapolis, Minnesota. The State of Wisconsin's bank then electronically transfers the funds to the third-party processor's designated bank, and the third-party processer's bank electronically transfers the funds to the retailer's designated bank account.

20. Accordingly, regardless of whether the retailer contracted directly with FIS or used a third-party processor, all SNAP transactions conducted in Wisconsin using a Quest card result in one or more wire communications in interstate commerce and one or more electronic transfers of funds in interstate commerce.

### III. HOT SPOT's Applications to Process SNAP Transactions

21. As part of this investigation, investigating agents have reviewed various documents and information from FNS and third parties relating to HOT SPOT, including but not limited to: (a) reauthorization documents to continue to participate in SNAP on behalf of HOT SPOT and additional documents submitted to FNS; (b) information regarding SNAP redemption figures for HOT SPOT; (c) merchant

applications and other information maintained by third party processors; and (d) records relating to various bank accounts held by individuals and/or HOT SPOT.

22. According to FNS records, on June 29, 2005, JABBAR, purportedly submitted a SNAP Application Form, seeking authorization to conduct SNAP transactions at the **Subject Premises** under the business name HOT SPOT. HOT SPOT was authorized to redeem SNAP benefits on July 6, 2005.

23. According to City of Milwaukee records, Hot Spot Investments, LLC owns the **Subject Premises**. According to records from the Wisconsin Department of Financial Institutions, JABBAR is the registered agent of both Hot Spot Investments and HOT SPOT.

24. According to FNS records, on November 17, 2018, HOT SPOT submitted a SNAP reauthorization form, FNS-252-R, to continue to participate in SNAP. This record indicates that JABBAR was HOT SPOT's only owner or officer.

25. The application listed HOT SPOT's address as 2643 W. Atkinson Ave., Milwaukee, Wisconsin (the **Subject Premises**), and identified business hours for all seven days of the week. The application listed HOT SPOT's total sales in tax year 2017 were $1,020,610 and that 70% of those retail sales (or $714,500) were from items eligible under SNAP.

26. FNS records also show that, as part of the application process, JABBAR electronically signed a certification acknowledging he agreed to comply with the terms of the SNAP benefits program and accepted responsibility on behalf of HOT SPOT and its employees for any potential violations of SNAP regulations. The

application included trading cash for SNAP benefits (trafficking), accepting SNAP benefits as payments on credit accounts or loans, accepting SNAP benefits as payment on ineligible items, and knowingly accepting SNAP benefits from people not authorized to use them.

27. On June 24, 2021, a FNS representative conducted a site visit of HOT SPOT at the **Subject Premises**. Records from the site visit indicate that HOT SPOT is approximately 13,000 square feet and has five aisles containing food and non-food items, shelves and coolers lining the walls containing grocery items and alcoholic beverages, and approximately 2,000 square feet of storage area.[1] There are no shopping baskets or shopping carts available for customers. The store has four cash registers and four EBT POS devices. In addition, according to this record, the owner reported to the FNS representative that they will deliver if a customer requests it. FNS records further demonstrate that HOT SPOT is classified as a "Medium Grocery Store," which FNS defines as, "a store that carries a moderate selection of all four staple food categories. They may sell ineligible items as well, but their primary stock is food items." According to FNS, it determines a store's classification based on information obtained from the store's SNAP application and any site visits conducted.

28. In addition, according to City of Milwaukee licensing records, HOT SPOT maintains a Cigarette and Tobacco License, a Class A Malt & Class A Liquor License, and a Food Retail License under the trade name "I Shop Supermarket" at

[1] According to an FNS site survey at HOT SPOT conducted on February 26, 2019, there is storage in the basement of the **Subject Premises**.

the **Subject Premises**. This same record includes a physical description of HOT SPOT as the first floor, coolers, and basement of the **Subject Premises**. In addition, this same record lists JABBAR as the agent for these licenses at the **Subject Premises**.

29. According to information from the Milwaukee Police Department, approximately one year ago law enforcement observed the second floor of the Subject Premises to be accessible from the retail store area. Law enforcement also observed that the second floor was unoccupied, and the walls were not finished with the studs exposed. According to my review of law enforcement records, there is no apartment or unit number associated with the Subject Premises.

30. According to IRS-CI's review of records from Fiserv, a third-party processor, HOT SPOT uses Fiserv's merchant processor services to accept various card sales to include EBT cards, debit cards, and credit cards. Fiserv records from June 1, 2023, through December 31, 2023, and showed lump sum deposits, which include EBT SNAP transactions, deposited into HOT SPOT's business account ending in 5938 at Tri City National Bank ("Tri City").

31. According to IRS-CI's review of records from Tri City, there are three accounts associated with JABBAR: two business bank accounts in the name of HOT SPOT, one ending in 5938 and ending in 6148; and a personal account held by JABBAR and NIRSEEN JABBAR ("N. JABBAR"), ending in 5260. According to law enforcement's review of these records, the first business bank account of HOT SPOT regularly receives SNAP redemption deposits. According to Tri City records, JABBAR

and N. JABBAR are the only signatories for both business accounts and the personal account.

32. From June 2023 through December 2023, Fiserv deposited approximately $955,348.05 in SNAP EBT redemptions into the business bank account ending in 5938 and approximately $465,865 for credit and debit transactions. A review of the bank statements reveals a pattern of cash withdrawals and transfers from this business account to the personal bank account ending in 5260 shortly after deposits from Fiserv. The total cash withdrawn during this period was approximately $405,205.68 and the total of transfers to the personal account was approximately $83,908.00.

33. Also, during this same time period, the bank statements show payments to vendors for large amounts, which were often returned due to insufficient funds because the money has already been withdrawn in cash or transferred to the personal bank account. The total denied payments for alcohol vendors was approximately $93,535.73 and the total denied payments for non-alcohol vendors, to include grocery vendors, was approximately $195,974.40.

## IV. FNS Identifies Indicators of Fraud at HOT SPOT

34. FNS has primary authority for monitoring any fraudulent activity by retailers participating in the SNAP benefits program. FNS attempts to identify such fraud, in part, by utilizing a computer system known as the Anti-Fraud Locator Using Electronic Benefits Retailer Transactions (the "Anti-Fraud Locator System"). This system receives transaction records from EBT processors and conducts analyses of

patterns in the data that may indicate potentially fraudulent activity by retailers. FNS investigators then use these reports to identify stores whose data is suggestive of possible violations.

35. According to the Anti-Fraud Locator System, HOT SPOT redeemed approximately $1,399,572.25 in SNAP benefits from June 2023 through April 2024. The following chart summarizes the monthly amount of SNAP benefits redeemed by HOT SPOT during that time period:

| Month | SNAP Redemptions |
|---|---|
| Jun. 2023 | $168,531.06 |
| Jul. 2023 | $144,919.97 |
| Aug. 2023 | $128,425.14 |
| Sep. 2023 | $121,483.16 |
| Oct. 2023 | $124,312.94 |
| Nov. 2023 | $126,959.71 |
| Dec. 2023 | $125,529.16 |
| Jan. 2024 | $123,293.52 |
| Feb. 2024 | $117,469.10 |
| Mar. 2024 | $102,514.13 |
| Apr. 2024 | $116,134.36 |
| **Total:** | **$1,399,572.25** |

36. In addition, between June 2023 and January 2024, HOT SPOT also significantly exceeded the average amount of redemptions for comparable stores in Milwaukee County during that time period. As reflected in the chart set forth below, information provided by FNS indicates that the average amount of total SNAP redemptions for a store classified as a “Medium Grocery Store” in Milwaukee County was approximately $204,985.39 between June 2023 and January 2024, which would

be more than five times less than the total redemptions at HOT SPOT during that same time, as set forth below:

| | Hot Spot Supermarket | Other "Medium Grocery Store" |
|---|---|---|
| Total Redemptions: | $1,063,454.66 | $204,985.39 |
| Average SNAP Redemption: | $40.65 | $42.39 |

37. Records from ALERT further indicate HOT SPOT's average SNAP transaction between June 2023 and January 2024 to be $40.65. According to this same record, during this period of time, HOT SPOT redeemed approximately $648,849.94 from SNAP transactions of $100 or more, despite no shopping carts or baskets being available for customers as observed during the FNS site survey.

38. Based on my training and experience and that of other agents investigating SNAP trafficking with whom I have consulted, the total redemption amounts at HOT SPOT exceeded the figures for comparable stores in Milwaukee County and are indicative of SNAP benefits trafficking, namely, exchanging cash for SNAP benefits.

39. As explained below, law enforcement conducted several controlled, undercover SNAP trafficking transactions at HOT SPOT.

## V. <u>Controlled Exchange of Cash for SNAP Benefits at the Subject Premises</u>

40. Between June 2023 and April 2024, investigating agents worked with a Confidential Human Source ("CHS") to conduct recorded, controlled SNAP

transactions involving the exchange of SNAP benefits for cash and the purchase of ineligible items at the **Subject Premises**.[2] On multiple occasions, at law enforcement's direction, the CHS purchased food and nonfood items using SNAP benefits and requested that the store clerk also charge the UCs' SNAP benefits in exchange for cash.[3] Prior to each controlled transaction, law enforcement had the CHS remove all cash, financial instruments, and personal electronic devices from their possession. Prior to each transaction, law enforcement equipped the CHS with a concealed recording device and a cell phone monitored by agents, and provided the CHS with a Wisconsin Quest card, specifically a SNAP benefit card issued to USDA OIG agents for the purposes of conducting SNAP benefit fraud investigations.

***a. June 15, 2023, Controlled Transaction***

41. On June 15, 2023, the CHS traveled to the **Subject Premises** for the purpose of attempting to exchange SNAP benefits for cash.

---

[2] **CHS Disclosure**: The CHS has an extensive criminal history to include multiple felony convictions. The CHS has been cooperating with law enforcement for monetary compensation since approximately March 2022. To date, law enforcement has paid the CHS approximately $600 for services rendered and information provided relating to HOT SPOT. The information provided by the CHS in this investigation has been corroborated in significant respects by audio and video recordings, and FNS SNAP redemption records. Therefore, I believe the information provided by the CHS to be reliable.

[3] On August 23, 2022, and October 12, 2022, at law enforcement's direction, multiple CHSs entered the **Subject Premises** and asked employees to exchange cash for SNAP benefits. On both occasions the CHSs were denied. On March 6, 2023, at law enforcement's direction, a CHS entered the **Subject Premises** and asked if they do cash back. The clerk advised the other clerk does. On March 7, 2023, at law enforcement's direction, a CHS entered the **Subject Premises** and again asked a clerk to exchange cash for SNAP benefits, which the clerk denied.

42. According to law enforcement surveillance and my review of the video recording, the CHS entered the **Subject Premises** at approximately 5:01 p.m. and encountered a known associate. The CHS advised they were looking to get cash back. The known associate then directed the CHS to the counter and requested the owner, known as "Miguel." Although JABBAR is the only owner of HOT SPOT, I believe that the known associate thought Miguel to be the owner due to their previous transactions with him.

43. Miguel, later identified as RAED AL SUWAILIH ("AL SUWAILIH"), then approached the CHS and the known associate.[4] The CHS and the known associate advised the CHS was looking for cash back. AL SUWAILIH asked if the CHS also wanted cigarettes. In response the CHS confirmed they did. AL SUWAILIH stepped away and returned with cigarettes.

44. The CHS then swiped their Quest card through a POS device and inputted their PIN. After multiple failed attempts by the CHS in swiping their Quest card, AL SUWAILIH then took the CHS's Quest card and swiped it through the POS device. The CHS then re-entered their PIN. AL SUWAILIH retrieved cash from the register behind the counter. AL SUWAILIH then counted the money in front of the CHS and provided it to them.

45. The CHS then provided the known associate with $10 cash for introducing them to AL SUWAILIH. In addition, according to the CHS, they had also

[4] AL SUWAILIH was identified based upon my review of the consensual monitoring video and AL SUWAILIH's Wisconsin driver's license.

paid for the known associate's grocery items in exchange for introducing them to AL SUWAILIH. The CHS exited the store and later met law enforcement at a predetermined location.

46. The CHS provided law enforcement the $170 cash, the grocery items (one bag of chips and one can of soda), the cigarettes, the video recording device, and the Quest card.

47. According to a third-party database utilized by FNS, on June 15, 2023, $408.06 was charged for the transaction associated with the CHS's Quest card at HOT SPOT. FNS records show the CHS's Quest card was swiped at approximately 5:07 p.m. using a POS device assigned to HOT SPOT's FNS number at the **Subject Premises** and $408.06 was credited to HOT SPOT.

***b. August 9, 2023, Controlled Transaction***

48. On August 9, 2023, the CHS traveled to the **Subject Premises** for the purpose of attempting to exchange SNAP benefits for cash.

49. According to law enforcement surveillance and my review of the video recording, the CHS entered the **Subject Premises** at approximately 3:05 p.m. and selected two bags of chips and one bottle of lemonade. The CHS approached the counter and stood in line behind other customers.

50. The CHS then observed AL SUWAILIH behind the counter.[5] The CHS provided AL SUWAILIH with the grocery items and a Wisconsin Quest card.

[5] AL SUWAILIH was identified based upon my review of the consensual monitoring video and AL SUWAILIH's Wisconsin driver's license.

According to the CHS, AL SUWAILIH recognized the CHS from a previous transaction. The CHS then requested to sell $100 in SNAP benefits for $50 cash back. AL SUWAILIH responded by agreeing to this request.

51. AL SUWAILIH then questioned the CHS's cellphone in their hand. AL SUWAILIH then examined the cellphone's lock screen. According to the CHS, AL SUWAILIH was concerned that the cellphone was recording this encounter. The CHS further advised that AL SUWAILIH had explained that his boss did not like him exchanging cash for SNAP.

52. AL SUWAILIH then processed the SNAP transaction and provided the CHS with $50 cash and cigarettes. The CHS exited the store and later met law enforcement at a predetermined location.

53. The CHS provided law enforcement the $50 cash, the grocery items, the cigarettes, the video recording device, and the Quest card.

54. According to a third-party database utilized by FNS, on August 9, 2023, $125.34 was charged for the transaction associated with the CHS's Quest card at HOT SPOT. The database shows the CHS's Quest card was swiped at approximately 3:10 p.m. using a POS device assigned to HOT SPOT's FNS number at the **Subject Premises** and $125.34 was credited to HOT SPOT.

***c. August 10, 2023, Controlled Transaction***

55. On August 10, 2023, the CHS traveled to the **Subject Premises** for the purpose of attempting to exchange SNAP benefits for cash.

56. According to law enforcement surveillance and my review of the video recording, the CHS entered the **Subject Premises** at approximately 3:08 p.m. and selected two bags of chips, one energy drink, and one package of Zinger cakes. The CHS then stood in line behind other customers.

57. The CHS then approached the counter and observed AL SUWAILIH behind the counter.[6] AL SUWAILIH advised he remembered the CHS. The CHS provided AL SUWAILIH with the grocery items and requested $50 cash in exchange for $100 off their Quest card. AL SUWAILIH responded by agreeing to this request. During this encounter, an unidentified Black male is observed behind the counter conversing with AL SUWAILIH. AL SUWAILIH processed the SNAP transaction and provided the CHS with $50 from the cash register and cigarettes.

58. The CHS exited the store and later met law enforcement at a predetermined location.

59. The CHS provided law enforcement the $50 cash, the grocery items, the cigarettes, the video recording device, and the Quest card.

[6] AL SUWAILIH was identified based upon my review of the consensual monitoring video and AL SUWAILIH's Wisconsin driver's license image.

60. According to a third-party database utilized by FNS, on August 10, 2023, $126.03 was charged for the transaction associated with the CHS's Quest card at HOT SPOT. The database shows the CHS's Quest card was swiped at approximately 3:09 p.m. using a POS device assigned to HOT SPOT's FNS number at the **Subject Premises** and $126.03 was credited to HOT SPOT.

***d. September 7, 2023, Controlled Transaction***

61. On September 7, 2023, the CHS traveled to the **Subject Premises** for the purpose of attempting to exchange SNAP benefits for cash.

62. According to law enforcement surveillance and my review of the video recording, the CHS entered the **Subject Premises** at approximately 1:34 p.m., and selected one package of candy, one bag of popcorn, one package of Swiss Rolls, and one bottle of juice.

63. The CHS approached the counter and stood in line with other customers. The CHS then approached the clerk, later identified as AL SUWAILIH, who was behind the counter.[7] The CHS provided AL SUWAILIH with the grocery items and requested cash back off their Quest card. AL SUWAILIH responded by asking how much, to which the CHS advised they did not know the balance on the card. The CHS and AL SUWAILIH agreed on $200 cash for $400 in Quest benefits. The CHS then

[7] AL SUWAILIH was identified based upon my review of the consensual monitoring video and AL SUWAILIH's Wisconsin driver's license image. In addition, a dark Lexus SUV bearing Wisconsin license plate number ATA 7142, was observed by law enforcement parked near the **Subject Premises**. According to State of Wisconsin records, AL SUWAILIH is the owner of this vehicle.

swiped their Quest card through a POS device. According to the CHS, AL SUWAILIH provided them with $200 cash retrieved from the back office.

64. The CHS exited the store and later met law enforcement at a predetermined location. The CHS provided law enforcement the $200 cash, the grocery items, the cigarettes, the video recording device, and the Quest card.

65. According to a third-party database utilized by FNS, on September 7, 2023, $473.67 was charged for the transaction associated with the CHS's Quest at HOT SPOT. The database shows the CHS's Quest card was swiped at approximately 1:40 p.m. using a POS device assigned to HOT SPOT's FNS number at the **Subject Premises** and $473.67 was credited to HOT SPOT.

***e. February 28, 2024, Controlled Transaction***

66. On February 28, 2024, the CHS traveled to the **Subject Premises** for the purpose of attempting to exchange SNAP benefits for cash.

67. According to law enforcement surveillance and my review of the audio and video recording, the CHS entered the **Subject Premises** at approximately 12:52 p.m., and asked an unidentified employee standing behind the counter if Miguel was there. The unidentified employee responded by directing the CHS to Baba's Grill across the street. The CHS exited the **Subject Premises** and proceeded to Baba's Grill.

68. According to City of Milwaukee licensing records, JABBAR is the agent for Baba's Grill, located at 4382 N. 27th St., Milwaukee, Wisconsin. After exiting the **Subject Premises**, the CHS accidently covered the video recording device.

69. The CHS entered Baba's Grill and encountered Miguel behind the counter. The CHS explained why they hadn't been around. The CHS indicated they had $398 on their Quest card. Miguel responded by explaining for food stamps the CHS would need to go to HOT SPOT, and that he would make a call. The CHS also asked for cigarettes. Miguel responded by stating, "yeah, he got you." The CHS exited Baba's Grill and proceeded back to the **Subject Premises**.

70. After exiting Baba's Grill and entering the **Subject Premises**, the CHS uncovered the video recording device.[8] The CHS entered the **Subject Premises** and explained to two unidentified males behind the counter that Miguel had said he was going to call over. JABBAR then approached the CHS and told them to hold on.[9] The CHS then selected two bags of chips and one alcoholic beverage. The CHS approached the counter and observed JABBAR on the phone. The CHS explained to JABBAR that Miguel had sent them over there. JABBAR again told the CHS to wait. When JABBAR was off the phone, the CHS asked if they were good. The CHS then asked for two packs of cigarettes. JABBAR responded by asking if that was it. The CHS indicated they have $398 on their Quest card. JABBAR then walked out of sight of the CHS.

---

[8] After this controlled transaction, I presented the CHS with AL SUWAILIH's Wisconsin driver's license image. The CHS identified AL SUWAILIH as Miguel.

[9] JABBAR was identified based upon my review of the consensual monitoring video and JABBAR's Wisconsin driver's license image. In addition, law enforcement observed a gray Cadillac SUV bearing Wisconsin license plate number: ALG 5204 parked near the **Subject Premises**. According to State of Wisconsin records, JABBAR is the owner of this vehicle. I showed JABBAR's image to the CHS, who did not recognize the photograph of JABBAR.

71. JABBAR returned to the CHS and asked, "what are we taking off, everything?" The CHS responded by stating, "yeah, if you want it." The CHS further advised they would accept $200 for $100. JABBAR responded by asking, "do you want to do more or less?" The CHS responded by stating, "I can do it all." JABBAR then asked the CHS for the time. The CHS checked the time. JABBAR responded by stating, "oh okay, so I know." The CHS explained to JABBAR they are carrying their phone in their jacket because they are wearing jogging pants.

72. Based upon my training and experience, I believe JABBAR had the CHS check their phone to see if it was recording this encounter.

73. JABBAR then appeared to process the transaction on a computer screen with NADER AHMAD SALEM ("SALEM") next to him.[10] JABBAR then walked away from the CHS. JABBAR returned and provided the CHS with the bagged grocery items, alcoholic beverage, cigarettes, and $150 cash.

74. The CHS exited the store and later met law enforcement at a predetermined location. The CHS provided law enforcement the $150 cash, the grocery items, the cigarettes, the alcoholic beverage, the audio and video recording device, and the Quest card.

---

[10] SALEM was identified based upon my review of the consensual monitoring video and SALEM's Wisconsin driver's license image. In addition, a white Honda van bearing Wisconsin license plate number: AJC 1736 was observed parked near the **Subject Premises.** According to State of Wisconsin records, a female subject with the same address as SALEM is the registered owner of this vehicle.

75. According to a third-party database utilized by FNS, on February 28, 2024, $358.52 was charged for the transaction associated with the CHS's Quest card at HOT SPOT. This database shows the CHS's Quest card was swiped at approximately 12:59 p.m. using a POS device assigned to HOT SPOT's FNS number at the **Subject Premises** and $358.52 was credited to HOT SPOT.

***f. March 14, 2024, Controlled Transaction***

76. On March 14, 2024, the CHS traveled to the **Subject Premises** for the purpose of attempting to exchange SNAP benefits for cash.

77. The CHS entered Baba's Grill and requested Miguel. An unidentified voice advised Miguel was not there. The CHS exited Baba's Grill and proceeded to the subject location. While at Baba's Grill, the CHS had accidently covered the video recording device.

78. According to law enforcement surveillance and my review of the audio and video recording, the CHS entered the **Subject Premises** at approximately 12:33 p.m. and selected two packages of ramen noodle soup, one bag of popcorn, one package of carrot cake, one package of gum, and one bottle of lemonade. The CHS approached the counter and observed JABBAR behind the counter.[11] The CHS asked for Miguel and asked if JABBAR remembered them. The CHS then asked for cash back. JABBAR responded by asking, "what do you have exactly on it?' The CHS responded

[11] JABBAR was identified based upon my review of the consensual monitoring video and JABBAR's Wisconsin driver's license image.

$439. JABBAR then quietly calculated the price of the transaction with the CHS and indicated he could not do it all. JABBAR then advises $175. The CHS responded by agreeing to this price. SALEM is also observed by the counter with JABBAR.[12]

79. The CHS then asked JABBAR what they can call him. JABBAR advised the CHS could call him whatever they wanted to call him.

80. JABBAR then bagged the grocery items and provided the CHS with $175 cash from the register. The CHS exited the store and later met law enforcement at a predetermined location.

81. The CHS provided law enforcement the $175 cash, the grocery items, the cigarettes, the audio and video recording device, and the Quest card.

82. According to a third-party database utilized by FNS, on March 14, 2024, $434.60 was charged for the transaction associated with the CHS's Quest card at HOT SPOT. This database shows the CHS's Quest card was swiped at approximately 12:37 p.m. using a POS device assigned to HOT SPOT's FNS number at the **Subject Premises** and $434.60 was credited to HOT SPOT.

***g. April 25, 2024, Controlled Transaction***

83. On April 25, 2024, the CHS traveled to the **Subject Premises** for the purpose of attempting to exchange SNAP benefits for cash.

[12] SALEM was identified based upon my review of the consensual monitoring video and SALEM's Wisconsin driver's license image.

84. According to law enforcement surveillance and my review of the audio and video recording, the CHS entered the **Subject Premises** at approximately 12:21 p.m., walked around the store, and selected one bottle of juice and two bags of chips.

85. According to the CHS and my review of the video recording, no shopping carts or baskets were available for customers.

86. The CHS placed their grocery items on the counter and continued to walk around. The CHS then observed JABBAR behind the counter walking away from them.[13] The CHS stated, "need to holler at you." Although now out of sight of the CHS, JABBAR can be heard stating, "somebody is coming."

87. AL SUWAILIH then approached the CHS and explained he is there visiting today but will help.[14] The CHS stated they have $200. AL SUWAILIH responded by explaining he doesn't know if they have it. The CHS asked for two packs of cigarettes. AL SUWAILIH responded by stating, "hold on, let me figure out what they got here." AL SUWAILIH appeared to yell to someone in Arabic, and an unknown voice responded in Arabic. AL SUWAILIH then informed the CHS he can't do it and to come back after two hours.

---

[13] JABBAR was identified based upon my review of the consensual monitoring video, images of JABBAR from previous recorded transactions, and JABBAR's Wisconsin driver's license image. In addition, during this transaction, a gray Cadillac SUV bearing Wisconsin license plate number ALG 5204 is observed parked behind the subject location. An unknown individual entered the SUV and departed the area while the CHS was inside the **Subject Premises**. According to State of Wisconsin records, this vehicle is registered to JABBAR.

[14] AL SUWAILIH was identified based upon my review of the consensual monitoring video, images of AL SUWAILIH from previous transactions, and AL SUWAILIH's Wisconsin driver's license.

88. The CHS exited and re-entered the **Subject Premises**. AL SUWAILIH told another customer to come back after two hours. AL SUWAILIH approached the CHS, who asked for the grocery items, one pack of cigarettes and one pint of Jose Cuervo tequila. AL SUWAILIH appeared to calculate the transaction on the register. The CHS then swiped their Quest card through a point-of-sale device. During this transaction, AL SUWAILIH was speaking in Arabic with someone on his cell phone. AL SUWAILIH appeared to provide the CHS with a package of cigarettes.

89. The CHS exited the store and later met law enforcement at a predetermined location. The CHS provided law enforcement the grocery items, the cigarettes, the tequila, the recording device, and the Quest card.

90. According to a third-party database utilized by FNS, on April 25, 2024, $52.56 was charged for the transaction associated with the CHS's Quest card at HOT SPOT. This database shows the CHS's Quest card was swiped at approximately 12:26 p.m. using a POS device assigned to HOT SPOT's FNS number at the **Subject Premises** and $52.56 was credited to HOT SPOT.

**ADDITIONAL INFORMATION REGARDING ITEMS TO BE SEIZED**

91. Based on my training and experience investigating SNAP fraud and wire fraud offenses, I know that evidence, instrumentalities, and fruits of these offenses typically can be found at businesses where SNAP trafficking is occurring, including the **Subject Premises**. Based on my training and experience, I also know that:

a. Evidence regarding the business's sources of income and expenses can be used to determine a reasonable estimate of the amount of SNAP and wire fraud conducted at the business. Such evidence includes evidence of legitimate revenue sources, which can be used to determine the business's fraudulent income, as well as fraudulent sources of income. Accordingly, evidence regarding all sources of the business's income—both legitimate and fraudulent—are relevant to proving the existence and scope of the SNAP and wire fraud occurring at the business.

b. Records of business expenditures can be used to determine a reasonable estimate of its legitimate SNAP and traditional sales, which when compared to its total sales, can be used to prove the existence and scope of SNAP and wire fraud. Evidence regarding the inventory of products in the store at the time of the search, for example, can be used to show that the store's inventory does not justify the amount of SNAP benefits it was redeeming. Records regarding historical expenditures also provide evidence that agents and analysts can use to determine the scope and amount of SNAP fraud and wire fraud conducted at the business. Businesses commonly keep records of business expenditures within their business premises.

c. Records relating to sales and income tax liabilities also provide information about the businesses' revenues, sales, and business expenses, among other things. Such records may assist investigating agents in

determining the existence and scope of SNAP and wire fraud offenses relating to the business. Businesses commonly keep records relating to their tax liabilities within their business premises.

d. Evidence regarding cash withdrawals by the store or its owners, operators, and employees and the amount of cash on hand at the store also commonly provides evidence of SNAP and wire fraud. A store that is conducting SNAP trafficking needs to maintain an "inventory" of cash to provide customers in exchange for SNAP benefits. Furthermore, the inventory of cash kept by businesses conducting SNAP fraud typically is derived from the profits obtained from previous SNAP trafficking activities. In such circumstances, the cash constitutes fruits of the offenses.

e. Based on my training and experience and that of other agents who investigate SNAP trafficking offenses, and analysis of SNAP redemptions for HOT SPOT compared to their SNAP-eligible sales reported in their SNAP reauthorization application and compared to redemptions for comparable stores in Milwaukee County, I believe that the majority of business being conducted at the Subject Premises is from SNAP transactions, which, if conducted legally, does not involve cash. Because the majority of HOT SPOT's business appears to be from SNAP transactions, I believe that HOT SPOT likely maintains only a small amount of cash on hand relating to legitimate cash sales. Publicly available information also suggests that stores in high-crime area limit cash on hand to avoid the

appeal of robbery. I know from my training and experience and discussions with law enforcement officers who work in Milwaukee that the Subject Premises is in a high-crime area. Based on the totality of the circumstances, I believe that any cash on hand at the Subject Premises greater or equal to $500 indicates that the cash is being used for SNAP trafficking and is therefore an instrumentality of the Subject Offenses.

f. Businesses engaged in SNAP fraud and wire fraud often use the proceeds of their fraud to purchase jewelry, bullion, real property, and other items of value. Such purchases may be made for personal gain or to conceal the source of illicit funds. Accordingly, such items may constitute both evidence and fruits of SNAP and wire fraud offenses. In addition, businesses often keep records of such items of value within their business premises, and businesses, especially those in high crime areas like the Subject Premises, commonly keep items of value in safes or safe deposit boxes in order to protect the items from theft.

g. Evidence of cash disbursements to SNAP recipients, including EBT receipts, ledgers, logs, and other financial and accounting records is relevant to showing that the store is engaged in a pattern of SNAP trafficking, as well as the loss amount attributable to the SNAP and wire fraud offenses. I know from my training and experience that businesses commonly keep such receipts, ledgers, and financial and accounting records within their business premises.

h. Evidence showing who owns the businesses operating at the Subject Premises, as well as who operates, works at, and profits from the businesses, also is relevant to proving the existence and scope of SNAP fraud and wire fraud and identifying and locating additional participants in the fraud and other individuals with knowledge of the offenses. Such evidence also assists in proving an individual's knowledge and intent to deceive. Accordingly, records relating to the ownership and operation of the business and its employees, including personnel files, work schedules, and payroll are relevant to proving SNAP and wire fraud offenses.

i. Evidence of FNS and SNAP instructional materials, including training videos, pamphlets, flyers, signs, and communications with FNS and the Wisconsin DHS, are relevant to showing the knowledge and intent of the owners, operators, and employees of the business. FNS, for example, sends the owner(s) of each authorized store materials regarding SNAP rules and regulations, and owners agree to ensure that all employees are instructed about SNAP rules and regulations, including the prohibition against exchanging SNAP benefits for cash.

j. Businesses engaged in SNAP trafficking frequently provide "loans" to SNAP customers in which the business provides cash to a customer in exchange for monthly amounts of SNAP benefits. In order to collect on such "loans," the business typically keeps the customer's EBT card, notations of how much the customer owes, and, in some cases, the

customer's state identification card or driver's license, which assists the business in changing the customer's PIN and potentially preventing the customer from obtaining a replacement EBT card. Frequently, these EBT cards are kept near the checkout area of the businesses.

k. Evidence of credit cards and debit cards used by the businesses operating at the Subject Premises and owners and operators of those businesses will provide evidence of bank accounts for which investigating agents can obtain records in order to track the businesses' sources of income and expenditures. Credit cards and debit cards of owners and operators working at such businesses also provide evidence of amounts of illicit funds received by those individuals, as well as their knowledge, intent, and periods during which they worked at the business.

l. As explained above, POS devices are being used at the **Subject Premises** to conduct SNAP trafficking transactions. POS devices commonly contain electronically stored information relevant to the investigation of SNAP fraud and wire fraud offenses. I know from my training and experience that USDA Special Agents can run a cancelled transaction using designated Quest cards on a POS device in order to determine a POS device's electronic identifiers, the FNS number or other account identifiers assigned to the POS device, and the payment processing company that services the device. This information, in turn, assists investigating agents in obtaining and analyzing records of prior use of that

device. In addition, I know that POS and other cash register devices commonly include a function that allows a user to print totals or subtotals for transactions recently conducted using that device. Such information can provide further evidence of patterns of use of that device.

m. Video recordings from surveillance systems also may provide additional evidence of SNAP fraud and wire fraud. Such video recordings may show individuals engaged in SNAP trafficking transactions at the **Subject Premises** and individuals working at the stores when SNAP trafficking transactions were occurring. Recordings also may show a large number of customers leaving the store with few or no SNAP-eligible items, which I recognize as indicative of SNAP trafficking based on my training and experience. And surveillance recordings may show meetings among participants in the fraud and allow investigating agents to identify potential conspirators, witnesses, and other individuals with knowledge of the offenses. I know from my training and experience that businesses in high-crime areas such as where the **Subject Premises** is located commonly have video surveillance systems on the interior and/or exterior to avoid robberies and thefts. I also know from my training and experience that stores in such areas that are known to be engaged in SNAP trafficking are frequently targeted for robberies and thefts because individuals are aware that the businesses need to keep large amounts of cash on hand to conduct SNAP trafficking. I know that video surveillance systems commonly require

designated hardware and/or software to review the surveillance footage captured by that system.

92. Based on my training and experience, various types of records referenced can be kept in hard copy and/or stored in electronic form on computers, tablets, cellphones, or other electronic storage media. I know that businesses commonly use one or more business computers or other electronic devices to maintain and analyze business records, including records of business revenues, expenditures, payroll, and profits. Even if such information is initially documented in hard copy, businesses frequently use computers and other electronic devices to maintain this information long term, to analyze it for profitability and other business metrics, and to prepare necessary records such as payroll and tax records. I know that computers and electronic storage devices used to maintain and analyze business records are commonly kept within the business premises.

93. Based on my training and experience, evidence regarding the use, ownership, and control of electronic storage devices that contain evidence is relevant to attributing incriminating evidence found on such devices or knowledge of such evidence to specific individuals. Evidence of the use, ownership, and control of such devices includes logins and passwords, evidence of file-sharing technology, items demonstrating the presence or absence of computer software that would allow others to control the items, the presence or absence of security software designed to detect malicious software, items showing the attachment of other computer hardware or storage media, device identifiers (such as IP addresses and MAC addresses), dates

and times at which devices were accessed, and counter-forensic programs designed to eliminate data.

## SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

94. This application seeks permission to search for evidence that might be found at the **Subject Premises**, and/or or the persons present at the **Subject Premises**, in whatever form is it found. One form in which the evidence might be found is data stored on a computer's hard drive, cellphone, or other storage media. Thus, the warrant for which I am applying would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

95. *Probable Cause.* I submit that if a computer, cellphone, or storage medium is found at the **Subject Premises** and/or on the person of Nael Jabbar or of employees present, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data

contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may resides in the free space or slack space – that is, in space on the storage medium that is not currently being used by an active file – for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media – in particular, computers' internal hard drives – contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operation system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence because special software is typically required for that task. However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the internet are sometimes automatically downloaded into a temporary internet directory or "cache."

96.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic

evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **Subject Premises** or on the person of Nael Jabbar or of employees present, because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In

my training and experience, information stored within a computer or storage media (*e.g.*, registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a business. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have

geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (*e.g.*, a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (*e.g.*, internet searches indicating criminal planning), or consciousness of guilt (*e.g.*, running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence

is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

97. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of the premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

98. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

**BIOMETRIC UNLOCK**

99. The warrant I am applying for would permit law enforcement to obtain from NAEL JABBAR and employees[15] of the **Subject Premises** the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

[15] Based upon my conversation with other law enforcement personnel, the Subject Premises is known to be located in a high-crime area. In addition, based upon my review of the video recordings and law enforcement surveillance, employees of HOT SPOT have not been observed wearing clothing that identifies them as employees. Due to these reasons, upon execution of the warrant, law enforcement plans to detain all individuals present in the Subject Premises until employees of HOT SPOT have been identified.

100. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

101. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

102. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those

of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

103. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

104. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using

a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

105. Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of NAEL JABBAR and employees of the **Subject Premises** to the fingerprint scanner of the device; (2) hold the device in front of the face of NAEL JABBAR and employees present at the **Subject Premises** and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

106. The proposed warrant does not authorize law enforcement to require that the aforementioned person state or otherwise provide the password, or identify specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the device. Nor does the proposed warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person to state or otherwise provide that information. However, the voluntary disclosure of such information by the aforementioned person(s) would be

permitted under the proposed warrant. To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person(s) for the password to the device, or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks the device, the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

## CONCLUSION

107. Based on the above information, I respectfully submit that there is probable cause to believe that SNAP benefits fraud and wire fraud offenses, in violation of Title 7, United States Code, Sections 2024(b)(1) and (c), and Title 18, United States Code, Section 1343, have been committed, and that evidence relating to this criminal conduct, as further described in Attachments B, will be found in the **Subject Premises**, as further described in Attachment A.

108. I therefore respectfully request that this Court issue a search warrant for the **Subject Premises** located at 2643 W. Atkinson Ave., Milwaukee, Wisconsin 53209, described further in Attachment A, authorizing the seizure of the items described in Attachment B.

## ATTACHMENT A

## PREMISES AND PERSONS TO BE SEARCHED

1. The **Subject Premises** is located at 2643 W. Atkinson Ave., Milwaukee, Wisconsin 53209, including the retail store area, basement, second floor area, and any adjoining storerooms or employee areas. The **Subject Premises** is a two-story building accessible through an entrance located at the front of the building and behind double glass doors. Photographs of the **Subject Premises** are set forth below.



2. The person of Nael Jabbar and of employees present at the **SUBJECT PREMISES**, including all items in their possession, on their person, or in areas within their immediate control.

3. The gray Cadillac Sport Utility Vehicle bearing Wisconsin plate number: ALG 5204 present at the **SUBJECT PREMISES**.



WISCONSIN
ALG-5204

## ATTACHMENT B
## PROPERTY TO BE SEIZED

Evidence, instrumentalities and fruits concerning violations of SNAP benefits fraud, in violation of 7 U.S.C. Sections 2024(b)(1) and (c), and wire fraud, in violation of 18 U.S.C. Section 1343, as follows:

1. Records of SNAP and non-SNAP sales transactions, including EBT records, sales tapes, receipts, and ledgers;

2. Records of store inventory and product orders, including invoices, bills, delivery receipts, items of payment, payment receipts, vendor information, and ledgers;

3. Records of cash disbursed to SNAP recipients, including EBT records, ledgers, and logs;

4. United States currency over approximately $500, jewelry, bullion, and other items of value exceeding approximately $500;

5. Records and keys relating to safe deposit boxes;

6. Records of payments received from SNAP, including bank account records, merchant records from third-party processors, and receipts;

7. Correspondence and records related to U.S. Department of Agriculture, Food and Nutrition Service, SNAP benefits, and other Food and Nutrition Service programs;

8. POS devices and cash register devices and any associated documents, including instruction manuals;

a. With respect to searches of POS devices and other cash register devices,

investigating agents may conduct a cancelled transaction on such devices in order to identify electronically stored information, including device identifiers, any FNS number or other account identifiers assigned to the device, and the identity of the payment processing company that services the device;

b. With respect to searches of POS devices and other cash register devices, investigating agents may also cause the device to print a receipt or otherwise provide information regarding totals or subtotals run electronically stored in the device at the time of the search;

9. Surveillance footage showing SNAP trafficking being conducted at the **Subject Premises**, including any exterior footage showing customers leave the store with few or no grocery items eligible for SNAP;

10. Any credit and debit cards, Quest/EBT cards, customer state identification cards and driver's licenses, and related records;

11. Employee lists and contact information, work schedules, personnel files, and payroll;

12. Any and all records related to the ownership and occupancy of the **Subject Premises** and ownership or possession of a financial interest in business being conducted at **Subject Premises**, including correspondence, agreements, contracts, stock certificates, articles of incorporation, business licenses, Food and Nutrition Service applications, state and federal tax records, bank records, accounting records, checkbooks, copies of deposited or withdrawn check, ledgers, and payment receipts;

13. Computer hardware, computer software, computer-related equipment, employee cellphones, surveillance video system, and other electronic devices, as necessary to facilitate the seizure of the items described in this attachment;

14. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates

to the crime under investigation;

f.       evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.       evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.       evidence of the times the COMPUTER was used;

i.       passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.       documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.       records of or information about Internet Protocol addresses used by the COMPUTER;

l.       records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.       contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any

mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smart phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

During the execution of the search of electronic devices, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of Nael Jabbar or of employees present to the fingerprint scanner of the device; and/or (2) hold the device in front of the face of Nael Jabbar or of employees present and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

This warrant authorizes a review of electronically stored information on the device in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the agents may deliver a

complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.